Filed 6/29/21  P. v. Wejbe CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059155 |
| v. | (Super. Ct. No. 19HF0803) |
| MATTHEW RYAN WEJBE, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Matthew Ryan Wejbe of two counts of unauthorized use of the personal identifying information of another person (Pen. Code, § 530.5, subd. (a) (counts 1 & 2)), and one count of fraudulently acquiring or retaining the personal identifying information of another person (Pen. Code, § 530.5, subd. (c)) (count 3)).[1] Appellant admitted bifurcated allegations of a prior identity theft conviction as applied to count 3 (§ 530.5, subd. (c)(2)), and that he committed all three offenses while out on bail on a different case (§ 12022.1, subd. (b)).

The trial court sentenced appellant to a term of five years in the county jail, comprising an upper term of three years on count 1, plus a consecutive two-year term for the crime-bail-crime enhancement. A consecutive two-year sentence was imposed on count 2, and stayed under section 654. A concurrent two-year sentence was imposed on count 3.

Appellant contends: (1) The trial court erroneously denied a motion to suppress some of his in-field statements to a sheriff's deputy because they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) His trial counsel was constitutionally ineffective for allowing appellant to admit to the crime-bail-crime enhancement when he was in fact out on bail on a misdemeanor case at the time, and not a felony case; (3) The concurrent term imposed on count 3 should also have been stayed pursuant to section 654; and (4) The trial court abused its discretion by declining to reduce his three felony convictions to misdemeanors pursuant to section 17, subdivision (b) (hereafter simply 17(b)).

We reject appellant's *Miranda* claim because he was not in custody when he made the statements at issue. As to the crime-bail-crime enhancement, we need not resolve the constitutional question of trial counsel's competence because appellant was not subject to the enhancement when he was out on bail on a misdemeanor case, and it

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

must therefore be reversed as a matter of law.  We reject appellant's section 654 claim as to count 3, finding substantial evidence supports the trial court's conclusion appellant entertained an intent and objective in the commission of count 3 different from that in counts 1 and 2.  Finally, we conclude the trial court did not abuse its discretion in denying appellant's 17(b) motion because no such motion was made in that court.

The judgment is therefore affirmed in part, reversed in part, and remanded for resentencing.

FACTS

Because appellant does not contest the underlying factual particulars, we need not recite them in extensive detail.  Additional facts relevant to the specific issues he raises on appeal are found in the discussion below.

One morning at about 7:30, Sheriff's Deputy Fausto Mier responded to a disturbance call at a hotel regarding "a male who was in the parking lot creating a disturbance by yelling and pulling on door handles."  When he arrived, Mier found appellant in the hotel parking lot, "making certain movements" and "talking loudly."  In appellant's wallet Mier found a Visa debit card belonging to a person named Dayna J.  Appellant told Mier he found the card earlier that morning at a nearby Shell gas station, but denied using it.

Mier later went to the Shell station and spoke to the manager.  He obtained the 1:00-1:45 a.m. outside surveillance video from the morning of the incident, which showed Dayna J. arrive at the gas station at about 1:14 a.m. in a white truck and go inside.  When he returned to his truck at 1:16, Dayna J. appeared to accidentally drop a card on the ground near one of the gas pumps.  The video showed appellant later walk by and pick up the card off the ground at 1:37 a.m.

Mier also got videos from cameras inside the store, time-stamped 1:40 to 1:46 a.m., which showed appellant at the front counter making two transactions using a card and an unsuccessful attempt to use the card a third time.  Mier obtained a copy of a

3

written transaction receipt for a 1:42 a.m. use of Dayna J.'s Visa debit card, which matched one of the times appellant was depicted in the video using the card. The receipt also showed the card was capable of being used either as a credit card or a debit card. In this instance, it was used as a credit card, which did not require entering a PIN to complete the transaction.

When appellant unsuccessfully tried to use the card the third time, the video showed him telling the clerk the card was being declined because, "[M]y fiancé[e] is using my card too. She's been using so much of my fucking money." He explained, "You know what's weird man? My fiancé[e] I just talked to on the phone[,] I know she used this card the other day. . . ."

Mier later contacted and met with Dayna J. at his residence. While there, he saw the same white pickup truck depicted in the surveillance video. Dayna J. did not testify at trial.

In his defense, appellant testified Dayna J. was his longtime friend, and allowed him to use his debit card at the gas station. He claimed he gave Dayna J. $40 in cash in exchange for the use of his debit card. He did not explain why Dayna J. did not just hand him the card and instead dropped the card on the ground for appellant to later come pick up. Rather, he insisted he asked Dayna J., "Am I able to just use your card?" and Dayna J. told him, "Well, if you found it, then you can." Appellant said, "I wasn't sure if I was able to just use someone else's credit card, but he said if he dropped it and I picked it up, it [*sic*] wouldn't be anything wrong with that." He also claimed he was going to give the card back to Dayna J. later that day, and this was why he had kept it in his wallet instead of throwing it away. When asked if Dayna J. was such "a good friend of yours[,] where is he?" appellant said he had not talked to Dayna J. since his arrest, and did not even know Dayna J.'s phone number. He explained, "I have about a thousand friends. I don't know any of their numbers by heart." Appellant initially admitted he never told Mier that Dayna J. was his friend and had given him permission to use the

4

card.  He later changed his story, and said he did tell Mier in the patrol car on the way to jail, but "he didn't want to hear it."

DISCUSSION

*Custodial Interrogation*

Appellant first contends the statements he made to Deputy Mier about the debit card should have been suppressed because he was improperly subjected to custodial interrogation without first having been advised of his *Miranda* rights or waiving them and agreeing to speak.  We agree with the trial court's determination that *Miranda* was not applicable during the relevant part of the hotel parking lot encounter.  As the *Miranda* court itself clarified, "General on-the-scene questioning as to facts surrounding a crime . . . is not affected by our holding."  (*Miranda, supra,* 384 U.S. at p. 477.)  Mier's initial investigative inquiries in the parking lot were such questioning.

Appellant brought a pretrial motion to suppress his statements to Mier, raising the same grounds he reiterates on appeal.  No witnesses were called at the motion hearing.  Instead, the trial court reviewed a video recording from Mier's patrol car dash-camera, which captured the encounter between appellant and Mier on the morning in question.  Describing what the video showed, the court found the following:[2]

According to the dash-camera's clock, Mier arrived at the hotel parking lot at 7:39 a.m., and attempted to get appellant's attention.  Appellant ignored Mier and walked away.  Mier got out of his car and followed, and appellant continued to ignore him.  Mier finally "ma[de] contact with [appellant]."  At 7:40, "They go back to the car. [Appellant] is not in handcuffs," and he is "not placed in the patrol car."  "[Appellant] is leaning on the front of the patrol vehicle right in front of the dash camera.  [Mier] inquires at 7:41 'Are you okay, do you need any medical attention?' because right at the

---

[2]     Appellant does not challenge the trial court's account of what the video depicted, and instead only contests its legal conclusion he was not in custody for *Miranda* purposes.  We have independently reviewed the video and find the court's descriptions are factually accurate.

5

beginning the officer detects that something may be wrong with [appellant] due to his physical observations.  [Mier] asked him, 'Have you slept?' [Mier] was checking on [appellant's] welfare."[3]

At 7:43 appellant gave consent to search and, when asked, he "couldn't give a straight answer" and "didn't know if he was on probation [or] on parole."  The court said, "It was very clear to this court that at 7:48, which is only 9 minutes after the initial contact[,] it turned into a [Health & Safety Code section] 11550 under the influence [of drugs] investigation."  "And yes, at 7:48 [Mier] says, 'You're not free to go, you're being detained for possible under the influence.'"

"Then at 7:54, which is less than 20 minutes after the initial encounter," there is more talk about parole, and appellant again said he was not sure.  Mier tells him: "Well, I'm going to check.  Whatever you're on I'm going to check your conditions . . . ."  Mier then called the probation department, "attempting to verify what type of supervision" appellant was subject to.

Meanwhile, Mier told appellant, "Well, you know what, I'm going to take your pulse because you're exhibiting symptoms that are consistent with under the influence."  The court pointed out that: "[C]onsistent with the initial under the influence investigation [Mier] starts asking the under the influence questions.  Have you had anything to eat?  What is the status of your health?  Have you taken any meds?  Are you on any meds?  Have you slept?  Do you have any head injuries?"  The court concluded: "So this is all consistent with an under the influence investigation.  Meanwhile, no one raised their voice.  No one was yelling.  No one was barking out commands.  In the court's mind it was a very cordial exchange of information."

At 8:06, Mier "does a nystagmus eye test looking for any deviation in the eyes.  Again, he checks the pulse.  And then at 8:11 more tests."  "Then, at 8:14, which is

---

[3] The video also shows that at 7:42, Mier told appellant, "If you're OK, you'll be free to go."

6

only 35 minutes after all this has taken place, there is a conversation about the [debit] card, and [appellant] makes a statement that he found it at the Shell station and he says twice that he did not use it."

Finally, the court found that: "At 8:32, [Mier] believed [appellant] was under the influence of a controlled substance and arrested him . . . . [¶] But the talk about the card came only 35 minutes during [*sic*] the investigation for under the influence . . . ." The court concluded *Miranda* did not apply because appellant was not in custody at 8:14, and "questions during consensual encounters, detentions, and pat-downs are not custodial for *Miranda* purposes."

On review of a trial court's decision on a *Miranda* issue, "'we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*.' [Citations.]" (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.) When part or all of the questioning was recorded, the facts are undisputed, and we independently review the trial court's factual determinations. (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

"Police officers are not required to give *Miranda* warnings to everyone they question." (*In re I.F.* (2018) 20 Cal.App.5th 735, 759, citing *Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) Thus, if a defendant is not in custody when he makes incriminating admissions to police, *Miranda* has no application. (*People v. Stansbury* (1995) 9 Cal.4th 824, 833 ["'*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody"'"]; *People v. Clair* (1992) 2 Cal.4th 629, 679 [absent custodial interrogation, *Miranda* "'simply does not come into play'"].)

"The purpose of *Miranda* guides the meaning of the word 'custody,' which refers to circumstances 'that are thought generally to present a serious danger of coercion.' [Citation.] Such a danger of coercion is usually present where there has been

7

a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" [Citations.] The key question is whether, under all of the objective circumstances, a reasonable person in the suspect's position would have felt free to terminate the interrogation." (*People v. Caro* (2019) 7 Cal.5th 463, 491.) But even if a person's freedom of movement has been curtailed, an "additional question" arises: "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (*Howes v. Fields* (2012) 565 U.S. 499, 509.) Consequently, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Id.* at pp. 508-509.)

And "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (*California v. Beheler* (1983) 463 U.S. 1121, 1125, citing *Oregon v. Mathiason, supra,* 429 U.S. at p. 495.)

Appellant argues Mier's "questioning was custodial as appellant was detained and was not free to leave." However, this erroneously conflates a "detention" with "custody." The fact appellant was detained at the time Mier questioned him does not, without more, compel a conclusion he was in custody for *Miranda* purposes. Thus, "[a] custodial interrogation does not occur where an officer detains a suspect for investigation[.]" (*People v. Davidson* (2013) 221 Cal.App.4th 966, 970; see *Miranda, supra*, 384 U.S. at p. 477 ["General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding"].) Instead, a detention "allows 'the officer . . . [to] ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.' [Citation.]" (*People v. Clair, supra,* 2 Cal.4th at p. 679.)

8

It is of course true a police officer is not going to let a defendant go during a detention; that is why it is a detention and not a mere consensual encounter. But that restraint does not transform such a contact into "custody" for purposes of *Miranda*. Rather, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." (*Maryland v. Shatzer* (2010) 559 U.S. 98, 112.) Otherwise, all questions asked during a detention would be custodial and require *Miranda* warnings. (See *Berkemer v. McCarty* (1984) 468 U.S. 420, 439 [answers to investigatory questions by police officer who lawfully detains a person pursuant to a traffic stop are admissible even if the person was not given *Miranda* warnings].) Furthermore, the issue "'is not whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with formal arrest.'" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403, fn. 1.)

Factors relevant to this inquiry include: "'(1) whether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.'" (*People v. Davidson, supra,* 221 Cal.App.4th at p. 972.) Similarly, we look to "whether the officer informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement, whether the police were aggressive, confrontational, and/or accusatory, and whether the police used interrogation techniques to pressure the suspect." (*Ibid.*)

Here, appellant was not arrested until long after he made his statements about the debit card 34 minutes into the initial detention.[4] Appellant was detained in a public outdoor hotel parking lot, was not handcuffed or placed inside a patrol car, and no weapons were exhibited. Although at one point there was more than one deputy present

---

[4] According to the dash-camera clock, appellant was detained at about 7:40 and his statements regarding the debit card were made at 8:14.

9

as back-up, only Mier questioned appellant, and he did not conduct a lengthy stationhouse-style interrogation; it was a routine in-field under the influence inquiry. The questioning was always investigatory and never "'hostile, menacing, or accusatory.'" (*People v. Kopatz* (2015) 61 Cal.4th 62, 81.) And as the trial court aptly observed, Mier's demeanor was "very cordial," and "no one raised their voice," "no one was yelling" or "barking out commands."

Mier told appellant he was being detained in order to determine if he was under the influence, and most of the detention involved Mier's attempt to determine whether he was. The questioning about the debit card was almost incidental; it only lasted about a minute-and-a-half in the middle of the investigation, long before Mier's decision appellant was under the influence and was going to be arrested.

Mier administered several routine in-field tests as part of the investigation, but none was coercive or threatening: he took appellant's pulse several times, examined his eyes, measured his nystagmus response, and had appellant do a balancing test with his eyes closed and estimate the passage of 30 seconds. (Compare *Berkemer v. McCarty, supra,* 468 U.S. at p. 442 ["[A] single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists. Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest"].)

"[W]hether a suspect is 'in custody' [for *Miranda* purposes] is an objective inquiry." (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 270.) We conclude a reasonable person in appellant's position would not have believed there had been either a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.[5] The trial court correctly found Mier's pre-arrest questioning of appellant

---

[5] Indeed, the dash-cam video shows that when appellant was finally told he was going to be arrested, his previously cooperative and respectful demeanor radically changed, and instead of being chatty and polite, he became aggressive, resistant, and in the out-of-frame audio, we hear appellant angrily shouting at Mier that he could not "breathe" in the back of the patrol car.

about the debit card was not "custodial" for *Miranda* purposes. And even though he was detained, appellant "was not taken into custody for the purposes of *Miranda"* until after Mier obtained those statements. (*Berkemer v. McCarty, supra,* 468 U.S. at p. 442.) "Consequently, the statements [appellant] made prior to that point were admissible against him." (*Ibid.*)

*The Crime-Bail-Crime Enhancement*

Appellant next contends his trial counsel was constitutionally ineffective for allowing him to admit an enhancing allegation that, as a matter of law, did not apply in his case. We agree the enhancement did not lie but we need not resolve the constitutional question because we may independently reverse an unlawful enhancement for which there is no legal or factual basis.

Section 12022.1 provides a penalty enhancement for a defendant who, while on bail or his own recognizance release for a *felony* (the primary offense), commits another *felony* (the secondary offense). (§ 12022.1, subds. (a)(1), (a)(2), (b).) If the enhancement is pleaded and proved, and the defendant is convicted of both felonies, the defendant shall receive an additional two years in prison, and any prison sentence on the secondary offense must run consecutively to any prison sentence on the primary offense. (§ 12022.1, subds. (b) & (c), (e) & (f).)

Here, the amended information identified the "primary felony" as Orange County Superior Court case number 19NF0256, and the three felony charges in the current case as the secondary offenses. After the verdicts on the substantive counts, the trial court returned to the previously bifurcated crime-bail-crime enhancement. Having earlier waived a jury trial on the enhancement, appellant then waived his right to a bench trial on the allegation and admitted it. The court asked appellant, "So in other words, when you were out on bail on [case number] 19NF0256, you picked up this new credit card case in June 2019. [¶] Is that true?" Appellant replied, "Yes, your honor."

11

However, despite the fact appellant had just admitted the enhancing allegation, the court then took "judicial notice on [*sic*] 19NF0256 [appellant] was in court out on bail on June 10, 2019 in [Department] C-58 . . . [and] was present out on bail and [that] case got continued to 7/26/19." [6] "Then obviously we have this case, which occurred on June 19, 2019, which further corroborates [appellant's] admission that he was out on bail and then committed a new law violation while out on bail. [¶] I'm going to find this has been proven beyond a reasonable doubt. The crime bail crime has been proven to the court, and I will accept the admission and find that there is a factual basis for it and that the admission was knowingly and voluntarily made."

Thus, we are faced with an oddly anomalous situation where appellant appears to have simultaneously admitted the enhancement allegation *and* had it found true by the trial court sitting as the trier of fact following a bench trial. He pleaded guilty *and* was convicted after a trial, as it were. Even stranger, both were erroneous.

The trial court initially referred to case number 19NF0256 as a "felony case," but the prosecutor told the court, "It has a felony case number, but it's a drug possession misdemeanor now that I reduced [it]." Then, while sorting out appellant's other pending cases, the court agreed case number 19NF0256 was actually a misdemeanor case, although nothing in our record other than the prosecutor's comment supports that conclusion.

Similarly, the record does not reveal *when* case number 19NF0256 became a "misdemeanor case," nor whether appellant had been *convicted* in that case at the time

---

[6]     The record does not include, or even describe, just what it was the court took notice of regarding case number 19NF0256. At one point the prosecutor said he had "certified documents" from that case "downstairs," but there is nothing to indicate these documents were brought "upstairs," or otherwise presented to the trial court. (See Evid. Code, §§ 452, subd. (d)(1) & 453(b).)

12

of sentencing in the current case,[7] which was a prerequisite to the trial court imposing the enhancement. (See § 12022.1, subd. (d);[8] see also *People v. Walker* (2002) 29 Cal.4th 577, 582 [enhancement cannot be imposed unless the primary offense results in a felony conviction]; cf. *People v. Buycks* (2018) 5 Cal.5th 857, 890-891 [same when felony had been reduced to a misdemeanor under Proposition 47]; *People v. Reyes* (2016) 3 Cal.App.5th 1222, 1224 [same when reduced to misdemeanor under section 17(b)].)

Although for different reasons, both parties now agree the true finding on the crime-bail-crime enhancement must be stricken and its two-year consecutive sentence vacated. We concur. Simply put, there is nothing before us establishing *either* a factual basis for appellant's admission to the enhancement allegation, *or* substantial evidence to support the trial court's finding "beyond a reasonable doubt" as to its truth. "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case. Appellate courts are allowed to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing. [Citation.]" (*People v. Scott* (1994) 9 Cal.4th 331, 354; see also § 1260.) This is such a case. The crime-bail-crime enhancement is reversed.

---

[7] Before the sentencing hearing, the trial court continued a host of appellant's trailing and then-pending "misdemeanor" cases, including case number 19NF0256, "for pretrial only," to the sentencing date on the current case, strongly suggesting appellant had not yet been convicted on that case. The probation and sentencing report prepared after appellant's admission/true finding, states appellant had two pending felony cases and three pending misdemeanor cases, including one misdemeanor case involving simple drug possession charges from January 2019 in case number 19NF0256.

[8] "Whenever there is a conviction for the secondary offense and the enhancement is proved, and the person is sentenced on the secondary offense prior to the conviction of the primary offense, the imposition of the enhancement *shall be stayed pending imposition of the sentence for the primary offense*. The stay shall be lifted by the court hearing the *primary offense* at the time of sentencing *for that offense* and shall be recorded in the abstract of judgment." (§ 12022.1, subd. (d); italics added.)

*Section 654*

Appellant next contends the two-year concurrent sentence imposed on count 3 should instead have been stayed pursuant to section 654. We find substantial evidence supports the trial court's contrary sentencing decision.

Applying section 654, the trial court stayed imposition of sentence on count 2, the second of the two debit-card "use" offenses (§ 530.5, subd. (a)). On count 3 (§ 530.5, subd. (c)), the court imposed a "midterm, which would be two years," and although the court initially stayed it under section 654, it corrected itself and said: "Actually it wouldn't 654. It's really a separate crime. I know that it's a different section also. So I would pick midterm two years and run that concurrent on count 3."

Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) It "precludes multiple punishment for a single act or omission, or an indivisible course of conduct" (*People v. Deloza* (1998) 18 Cal.4th 585, 591 (*Deloza*), and ensures a defendant's punishment will be commensurate with his or her criminal culpability. (*People v. Kramer* (2002) 29 Cal.4th 720, 723). A trial court may not impose a *concurrent* sentence otherwise precluded by section 654, because the defendant is still subjected to the term of all imposed sentences, including those that are being served simultaneously. (*People v. Jones* (2012) 54 Cal.4th 350, 353; see *Deloza,* at p. 592 ["Section 654 does not allow any multiple punishment, including either concurrent or consecutive sentences].) Instead, if a defendant suffers more than one conviction, and punishment for one is barred by section 654, "that section requires the sentence for one conviction to be imposed, and the other imposed and then stayed." (*Deloza,* at pp. 591-592.)

"The starting point of a Section 654 analysis is to determine whether the 'different crimes were completed by a "single physical act.'" [Citations.] 'If so, the

defendant may not be punished more than once for that act," regardless of the defendant's intent and objective. [Citation.] 'Only if we conclude that the case involves more than a single act – i.e., a course of conduct – do we then consider whether that course of conduct reflects a single "'intent and objective'" or multiple intents and objectives.' [Citations.] 'Whether a defendant will be found to have committed a single physical act for purposes of [S]ection 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses.' [Citation.] When the facts are undisputed, the application of Section 654 raises a question of law we review de novo. [Citation.] We review any factual findings underlying the trial court's ruling for substantial evidence." (*People v. Washington* (2021) 61 Cal.App.5th 776, 795.)

Here, appellant was charged with committing two different physical acts: *using* another's personal information; and *obtaining* and *retaining* that information. Thus, the actus rei of the two offenses were distinct, and our analysis turns to whether appellant's course of conduct in this matter reflects multiple intents and objectives.

"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.) Conversely, section 654 does *not* apply to a course of criminal conduct where a defendant has separate but simultaneous objectives. (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1212, and cases cited there.)

For purposes of section 654, "'[t]he defendant's intent and objective are factual questions for the trial court[.]'" (*People v. Coleman* (1989) 48 Cal.3d 112, 162.) "'We review the court's determination of [a defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's

conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence.  [Citation.]'  [Citation.]"  (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.)

Although the pleadings and the jury's verdict forms in this case generically described all three counts as "identity theft," the offense charged in counts 1 and 2 is substantively different from that charged in count 3.[9]  As noted, counts 1 and 2 involved the unlawful *use* of another person's personal identifying information, whereas count 3 proscribed fraudulently *acquiring or retaining possession* of that same information.[10]

Thus, as to counts 1 and 2, "a conviction under section 530.5, subdivision (a) requires proof '(1) that the person willfully obtain[ed] personal identifying information belonging to someone else; (2) that the person use[d] that information for any unlawful purpose; and (3) that the person who use[d] the personal identifying information d[id] so without the consent of the person whose personal identifying information [was] being used.'"  (*People v. Jimenez* (2020) 9 Cal.5th 53, 63.)  Notably, it "does not require an intent to defraud."  (*People v. Hagedorn* (2005) 127 Cal.App.4th 734, 744.)  Indeed, "by its very terms, the offense of misuse of personal identifying information can be accomplished by acquiring the information with valid consent, using it for an unlawful purpose, and returning it."  (*People v. Jimenez,* at p. 63.)  Simply put, "'[t]he gravamen of the . . . offense is the unlawful use of a victim's identity.' [Citation.]"  (*Ibid.*)

In contrast, as to count 3, section 530.5, subdivision (c), does require fraudulent intent.  However, it has no requirement that the information be acquired or retained without the consent of its owner.  Rather, in order to find a defendant guilty of

---

[9]        "Some of the confusion about exactly what conduct section 530.5, subdivision (a) prohibits may be attributable to the fact that the [entire] statute is often referred to as an 'identify theft' statute."  (*People v. Barba* (2012) 211 Cal.App.4th 214, 226.)

[10]        "Personal identifying information" includes any "name" or "credit card number of an individual person," or "an equivalent form of identification."  (§ 530.55, subd. (b).)

16

violating section 530.5, subdivision (c), the prosecution must simply prove the defendant acquired or kept the personal identifying information of another person, and did so with an intent to defraud. (See CALCRIM No. 2041.)

Moreover, as to "intents," the offense committed in counts 1 and 2 is a general intent crime, whereas count 3 has a distinct mens rea of specific intent. And because section 530.5 "protects the person whose *information* was obtained rather than the person whose *property* was taken. The perpetrator need not even be in possession *of property* that contains personal identifying information; he or she can violate section 530.5(c) by simply retaining the *information* (by memory or otherwise) and intending to use, or actually using, it to defraud the person whom it identifies." (*People v. Weir* (2019) 33 Cal.App.5th 868, 876, fns. omitted.)

Therefore, appellant acted with two distinct mentes reae in committing these offenses, and the trial court could reasonably conclude he harbored divisible intents in doing so: he willfully and unlawfully twice *used* the debit card; but he also *obtained* it and *retained* it for future fraudulent purposes.

Similarly, the evidence supports an inference appellant had two different "objectives" in mind: to use the card at the Shell station; and then to retain it for future use. Semantically, it is true one cannot *use* personal identifying information without first having *acquired* it. And appellant did "acquire" the card when he picked it up off the ground at the gas station before he "used" it in his purchase and attempted purchase of merchandise. Hence, counts 1 and 2 involved both the acquisition and use of the information.

But appellant also *kept* the card, and perforce its crucial information, by replacing it in his wallet where it was found seven hours later by Deputy Mier. Thus, over and above his initial use of the personal identifying information, he retained that information for the future, whether to use it again, sell it, share it, or give it away. In other words, count 3. Had appellant merely discarded the debit card after using it at the

17

gas station, there is no question but that section 654 would apply to a resulting section 530.5, subdivision (c) conviction. But that is not this case; appellant retained possession of the card, with the requisite intent, and it was to that act count 3 referred.

A Visa credit-debit card like the one in this case is linked to an account that may be unfrozen or replenished. Appellant's third, unsuccessful, attempt to use the card at the gas station was declined, but if Dayna J.'s account were to be reopened or provided with a new amount of credit, the personal identifying information embodied in the card could again be fraudulently used via appellant's "retention" of the card. Therefore, appellant's objective in retaining the information on the card was in addition to, and separate from, his original objective of merely using the card to make a couple of purchases at the Shell station.

Appellant cites *People v. Gaynor* (2019) 42 Cal.App.5th 794 (*Gaynor*), as authority for his argument, but that case actually supports the trial court's findings. *Gaynor* is similar to this case in that the defendant was convicted of three counts of "use" of personal information under section 530.5, subdivision (a), and on appeal the Attorney General conceded that two of these three "use" counts should have been stayed under section 654. (*Id.* at p. 797.) However, and not unlike the case before us, the *Gaynor* court held section 654 did not apply to a separate count of possessing a completed check with the intent to defraud (§ 475, subd. (c)), even though the defendant had "used" the victim's information (the victim's Visa card) in his attempt to cash the forged check. (*Gaynor,* at p. 804 ["[P]ossessing a check with the intent to defraud Chase Bank . . . created a harm that was distinct from the harm that [defendant] created in using [the identity theft victim's] identity"].) So too here. Retaining Dayna J.'s card for a possible future fraudulent use created a potential "harm" distinct from the appellant's initial use of the card at the Shell station. Consequently, there is substantial evidence to support the trial court's decision not to stay execution of sentence on count 3, and appellant is not entitled to section 654 relief.

18

*The Phantom 17(b) Motion*

Appellant next contends "the trial court abused its discretion by refusing to reduce counts one through three to misdemeanors pursuant to Penal Code section 17(b)." (Capitalization omitted.) Not so. Both he and the Attorney General have misread the record. Appellant never requested the *trial court* reduce his felony convictions to misdemeanors. And having never been raised in the trial court, the 17(b) issue must perforce be deemed forfeited.

Neither party appears to realize appellant did not request to reduce his felony convictions to misdemeanors in the "trial court." Instead, both mistakenly cite to the *magistrate's* denial of appellant's 17(b) motion at the preliminary hearing as being one made by the "trial court."[11]

Appellant never formally brought a 17(b) motion, either at the preliminary hearing or in the trial court. Instead, at the close of the preliminary hearing, defense counsel simply orally "request[ed] the court exercise its discretion pursuant to [section] 17(b) as to the three identity theft [section] 530.5 charges because . . . the amounts are so small, and I just don't believe this is the kind of serious felony conduct where they are going in and buying thousands of dollars repeatedly on someone's card." In response, the magistrate "decline[d] to exercise its authority under Penal Code section 17(b)," and instead held appellant to answer to all three charged offenses as felonies. Appellant never mentioned 17(b) again.

"A magistrate's powers at a felony preliminary hearing are purely statutory." (*People v. Superior Court (Feinstein)* (1994) 29 Cal.App.4th 323, 328.) "'[O]nce a felony complaint has been filed and the defendant arraigned thereon, a magistrate's options are limited by the Penal Code." (*Ibid.*) The reduction from a felony to a misdemeanor "is permitted only because the Legislature specifically empowered

_____

[11] The magistrate and the trial judge were different as well: Judge John Adams heard the preliminary hearing, and Judge Gary Paer was the trial judge. So too were the prosecutors and defense counsel.

magistrates so to act. The authorization is in section 17, which provides: '(b) When a crime is punishable, in the discretion of the court, by imprisonment in the state prison or by fine or imprisonment in the county jail, it is a misdemeanor for all purposes under the following circumstances: [¶] . . . [¶] (5) When, at or before the preliminary examination or prior to filing an order pursuant to Section 872, the magistrate determines that the *offense* is a misdemeanor, in which event the case shall proceed as if the defendant had been arraigned on a misdemeanor complaint.'" (*Id.* at p. 329, italics added.) As a result, the only legal basis for a magistrate to entertain a 17(b) "request" is under subdivision (b)(5), and the denial of appellant's "request" must be construed as a denial under that subdivision. Conversely, however, by its very terms 17(b)(5) applies only to magistrates and not trial courts. Notably, it also only allows a magistrate to reduce applicable charged felony *offenses* to misdemeanors – not felony *convictions*.

After the magistrate's denial of his 17(b)(5) request at the close of the preliminary hearing, appellant failed to seek review of the ruling, either in the superior court or in this court.[12] More importantly, he did not *renew* his request in the actual "trial court," which could have been brought and considered post-conviction pursuant to 17(b)(1) or (b)(3).[13] (See *People v. Draper* (1996) 42 Cal.App.4th 1627, 1632, fn. 7 [defendant "may of course renew his request for the exercise of [17(b)] discretion *at the time of sentencing* under [17(b)(1) or (b)(3)]"] (Italics added).)

Therefore, the *trial court* did not abuse its discretion in denying appellant's 17(b) request because appellant did not make such a request, and the trial court did not

---

[12]     See §§ 995 & 999a; see also *People v. Manning* (1982) 133 Cal.App.3d 159, 166 ["Since there should be a method other than by writ to challenge a misapplication of Penal Code section 17, subdivision (b)(5), a Penal Code section 995 motion to set aside the charge provides a quick and efficient remedy"]; *Jackson v. Superior Court* (1980) 110 Cal.App.3d 174, 177-178 [same].

[13]     17(b)(1) provides that a court may declare an eligible offense a misdemeanor "*[a]fter a judgment* imposing a punishment other than imprisonment in the state prison or imprisonment in a county jail under the provisions of subdivision (h) of Section 1170." (Italics added.) (Cf. *People v. Superior Court (Jalalipour)* (2015) 232 Cal.App.4th 1199, 1207-1208 [reduction under 17(b) should not be granted until after a guilty plea or trial conviction].) Inapplicable here, 17(b)(3) involves a similar procedure in cases involving grants of probation.

deny one. Put differently, the court did not abuse its 17(b) discretion because it was never asked to *exercise* it.[14]

It is well established that the rule of forfeiture applies when a defendant has had the opportunity to request a trial court to grant discretionary relief but does not raise the issue until appeal. (See *People v. Scott, supra,* 9 Cal.4th at p. 356 ["[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal"]; and *id.* at p. 352, fn. 15 [cases cited]; cf. *People v. Carmony* (2004) 33 Cal.4th 367, 375-376 [forfeiture when defendant failed to seek dismissal pursuant to section 1385].) Because appellant failed to ask the trial court to exercise its 17(b) sentencing discretion, his 17(b) contention on appeal is forfeited.

DISPOSITION

The true finding on the crime-bail-crime enhancement is reversed, and the resulting two-year consecutive sentence is vacated. However, because the trial court imposed a concurrent sentence on count 3, remand for resentencing is necessary since the court retains discretion to consider imposing a different sentence on that count. (*People v. Cruz* (2020) 46 Cal.App.5th 715, 739; see *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 [a trial court may "revisit all prior sentencing decisions when resentencing a defendant"]; *People v. Buycks, supra,* 5 Cal.5th at p. 893 ["the full resentencing rule"]; *People v. Hill* (1986) 185 Cal.App.3d 831, 834 ["Not limited to merely striking illegal portions, the trial court may reconsider all sentencing choices"].)
Thus, we remand the matter to the trial court so that it may exercise its sentencing discretion anew. We express no opinion concerning whether or how the court should

---

[14] The issue of whether the *magistrate* abused its discretion in denying the 17(b)(5) request at the preliminary hearing is not before us. Moreover, a magistrate's denial of a 17(b)(5) request is not an appealable order. (See § 1237; see also fn. 12, *ante.*)

21

exercise that discretion on remand in light of the two-year reduction to appellant's sentence. (*People v. Cruz, supra,* 46 Cal.App.5th at p. 739.)

The matter is remanded to the trial court with directions to strike the enhancement, resentence appellant, and prepare an amended abstract of judgment. In all other respects the judgment is affirmed.



BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.